IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| DEXTER ALLEN, | ) | |
| | ) | |
|    Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  2:18-cv-02778 |
| | ) | |
| KENNETH J. BRAITHWAITE, | ) | |
| Secretary of the United States | ) | |
| Department of the Navy, | ) | |
| | ) | |
|    Defendant. | ) | |

**ORDER**

This is a failure-to-hire employment discrimination case. Plaintiff Dexter Allen brings this action against Defendant Kenneth J. Braithwaite, Secretary of the United States Department of the Navy, for race and color discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII").[1]   (ECF No. 1.)   Before the Court is Braithwaite's Motion to Dismiss, or in the alternative, Motion for Summary Judgment, filed on December 30, 2019.  (ECF No. 25.)  Allen

---

[1] Richard V. Spencer, former Secretary of the United States Department of the Navy, was the previously named defendant to this action.  On May 29, 2020, Braithwaite became the Secretary of the United States Department of the Navy.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court "automatically substitute[s] [Braithwaite] as a party." Fed. R. Civ. P. 25(d).

responded on January 24, 2020.  (ECF No. 27.)  Braithwaite replied on February 7, 2020.  (ECF No. 31.)

For the following reasons, Braithwaite's Motion to Dismiss, or in the alternative, Motion for Summary Judgment, is DENIED.

## I.   Background

Dexter Allen is an African American male whose color is brown. (ECF No. 31-1 ¶ 1.)  Allen worked for the United States Navy (the "Agency") as a Director of Security/ATFP (Anti-Terrorism Force Protection) Operations and Command Security Manager at Navy Recruiting Command ("NRC") in Millington, Tennessee, from 2012 to 2016.  (ECF No. 27 ¶ 4; ECF No. 31-1 ¶¶ 21, 22.)  Allen retired from active military service with the Navy around October 2016. (ECF No. 27 ¶ 3; No. 31-1 ¶ 21.)

On December 12, 2016, the Agency announced a job opening for a civilian position, titled Supervisory Security Specialist (the "Position"), located at the NRC in Millington, Tennessee.  (ECF No. 31-1 ¶ 19.)  Allen applied for the Position by submitting an application through USAJOBS.gov and was referred to the NRC hiring manager for résumé review and assessment of whether he should be interviewed.  (ECF No. 27 ¶¶ 5, 7.)

Résumé review and interview processes for Agency positions are conducted by a Selection Advisory Board ("SAB"), which consists of three Agency employees.  (ECF No. 31-1 ¶ 25.)  The SAB panel for the Position (the "Panel") consisted of: (1) James Blum,

Director of Supply Department/Logistics Management Officer at NRC;
(2) Daniel Harris, Bureau of Naval Personnel Security Manager; and
(3) Captain Hallock Mohler, then Commanding Officer and Executive
Director of Navy Recruiting District. (ECF No. 27 ¶ 10; No. 31-1
¶¶ 26, 71.)  Normally, the SAB is made up of racially diverse
members, but the Panel for the Position consisted of all Caucasian
males. (ECF No. 31-1 ¶ 77.)

Résumés are graded individually against a résumé matrix by
members of the SAB. (Id. ¶ 27.) Based on scores tallied from the
résumés, the SAB selects candidates to be interviewed. (Id. ¶ 28.)
According to the Bureau of Naval Personnel (BUPERS) Guide to
Civilian Hiring ("BUPERS Guide"), after the SAB members have scored
the résumés, "if there are significant differences in SAB members'
scores, the SAB should reconcile the differences (i.e. one member's
top candidate is another member's bottom candidate).  Members
should discuss why they assigned the score and give examples of
what they saw or did not see in the candidate's résumé." (ECF No.
25-10 at 13.)  The BUPERS Guide does not mandate this
reconciliation requirement for the interview process. (See id. at
14.)

On his résumé scoresheet, Allen tallied scores of 70, 90, and
80 (for an average of 80) and was selected to move to the interview
stage. (ECF No. 25-11; No. 31-1 ¶ 29.) Another candidate, Steven
Hickman (Caucasian, male) tallied scores of 85, 70, and 90 (for an

average of 82) and was also selected to move to the interview stage. (ECF No. 25-11; No. 31-1 ¶ 29.)

During the interview stage, the Panel asks interviewees the same eleven questions. (ECF No. 31-1 ¶ 30.) Each SAB member receives a scoring sheet for each interviewee in which the member scores each interviewee on each question. (Id. ¶ 31.) Each SAB member adds that member's scores for each question to get a total interviewee score from each SAB member. (Id. ¶ 32.) Scores from each member are averaged to get a final score for each interviewee. (Id. ¶ 33.) The interviewee with the highest average interview score is recommended by the SAB to the selecting official as the selectee. (Id. ¶ 34.) The interviewee with the second highest score is recommended by the SAB to the selecting official as the first alternate. (Id. ¶ 35.)

On February 2, 2017, the Panel interviewed Allen for the Position. (ECF No. 27 ¶¶ 8, 9.) At the conclusion of his interview, the SAB members gave him the following scores: Captain Mohler, 85; Harris, 87; Blum, 69, for an average total score of 80. (ECF No. 31-1 ¶¶ 41, 42.)

The Panel also interviewed Hickman. At the conclusion of his interview, the SAB members gave him the following scores: Captain Mohler, 81; Harris, 76; Blum, 85. (Id. ¶ 39.) Those numbers were averaged to give Hickman a total score of 81. (Id. ¶ 40.)

On February 3, 2017, based on their respective total scores, the Panel recommended to Captain Eric Cheney, Chief of Staff, NRC, that Hickman be selected for the Position and that Allen be the first alternate. (ECF No. 31-2 at 28 ¶ 30; id. at 108.) Captain Cheney forwarded the Panel's recommendation to Gary Peterson, Deputy Commander and Executive Director NRC, who was a selecting official for the Position. (ECF No. 31-1 ¶¶ 7, 72; No. 31-2 at 28 ¶ 30.) On June 14, 2017, the Agency notified Hickman that he had been selected for the Position. (ECF No. 27 ¶ 14.)

Braithwaite alleges that, on May 19, 2017, Yen Nguyen, a Human Resources Specialist at the Office of Civilian and Human Resources ("OCHR") Operations Center, notified Allen through USAJOBS.gov that he had not been selected for the Position. (ECF No. 25-3 ¶¶ 1, 7; id. at 3-4.) Allen says he never received that notification and that he first learned that he had not been selected when Timika Figgs, a colleague, told him so around September 13, 2017. (ECF No. 27-2 at 42:5-9.)

On October 4, 2017, Allen contacted an Equal Employment Opportunity ("EEO") Investigator and stated a claim of race and color discrimination. (ECF No. 31-1 ¶¶ 61, 62, 63.) On November 29, 2017, Allen filed a formal complaint with the Department of the Navy. (ECF No. 1 ¶¶ 16, 17.) On August 11, 2018, the Department of the Navy issued its Final Agency Decision. (Id. ¶

16.)   On November 11, 2018, Allen filed this action alleging violations of Title VII for race and color discrimination. (Id.)

During depositions in this case, it was discovered that Harris gave Allen the following scores for his answers to the eleven interview questions: 8, 8, 9, 9, 10, 9, 10, 10, 7, 8, and 9. (ECF No. 31-1 ¶ 43; No. 31-2 at 90, 91.)  On the interview spreadsheet, those numbers were mistakenly added for a total of 87. (ECF No. 31-1 ¶ 43; No. 31-2 at 90, 91.)  Adding those scores properly, Allen's total score from Harris should have been 97. (ECF No. 31-1 ¶ 44.)  Harris has admitted his scoring total of 87 for Allen was incorrect and the correct score was 97. (Id. ¶ 45.)  Had the correct score been used, Allen's average score would have been 83, making him the highest scoring candidate for the Position. (Id. ¶ 46.)

On December 30, 2019, Braithwaite filed the Motion to Dismiss, or in the alternative, Motion for Summary Judgment. (ECF No. 25.) Allen responded on January 24, 2020. (ECF No. 27.)  Braithwaite replied on February 7, 2020. (ECF No. 31.)

## II. Jurisdiction

The Court has federal question jurisdiction.  Under 28 U.S.C. § 1331, district courts have original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States."   Allen asserts a right to relief against Braithwaite for employment discrimination in violation of Title

VII.  (ECF No. 1 ¶¶ 60-83.)  That claim arises under the laws of the United States.

## III. Standard of Review

Braithwaite moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Allen has failed to state a claim upon which relief may be granted because he failed to timely exhaust his administrative remedies.  (ECF No. 25-1 at 6-8.) Alternatively, Braithwaite moves for summary judgment under Rule 56, arguing that, although Allen has established a prima facie case of race discrimination under Title VII, Allen cannot raise a genuine issue of material fact that Braithwaite's legitimate, non-discriminatory reason for failing to hire Allen was a pretext for discrimination based on color or race.  (Id. at 8-17.)

Braithwaite attaches an affidavit to support the administrative exhaustion argument raised by his Rule 12(b)(6) Motion.  (ECF No. 25-3.)  Because Braithwaite relies on matters outside the pleadings, and because both parties have had a reasonable opportunity to present materials pertinent to the administrative exhaustion argument and neither party will be surprised by the Court's conversion, the Court treats Braithwaite's administrative exhaustion argument, raised under Rule 12(b)(6), as one for summary judgment under Rule 56.[2]  See

---

[2] The decision to convert Braithwaite's motion to dismiss to one for summary judgment is supported by the fact that Braithwaite's Motion was

<u>Wysocki v. Int'l Bus. Mach. Corp.</u>, 607 F.3d 1102, 1105 (6th Cir. 2010) (citations omitted); Fed. R. Civ. P. 12(d).

Under Federal Rule of Civil Procedure 56(a), a court must grant a party's motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party must show that the nonmoving party, having had sufficient opportunity for discovery, lacks evidence to support an essential element of its case.  <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Peeples v. City of Detroit</u>, 891 F.3d 622, 630 (6th Cir. 2018).

When confronted with a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine dispute for trial.  <u>See</u> Fed. R. Civ. P. 56(c).  "A 'genuine' dispute exists when the plaintiff presents 'significant probative evidence' 'on which a reasonable jury could return a verdict for her.'"  <u>EEOC v. Ford Motor Co.</u>, 782 F.3d 753, 760 (6th Cir. 2015) (en banc) (quoting <u>Chappell v. City of</u>

---

filed after the scheduling order deadline to file motions to dismiss had passed.  On March 12, 2019, the Court entered a Scheduling Order setting June 10, 2019 as the deadline for the defendant to file motions to dismiss.  (ECF No. 17 at 1.)  Braithwaite's current Motion was not filed until December 30, 2019 -- 203 days after the Scheduling Order's motion to dismiss deadline had passed.  (ECF No. 25.)  Braithwaite did not move to extend or show good cause why the Court should excuse his late filing.  <u>See</u> <u>Century Indem. Co. v. Begley Co.</u>, 323 F.R.D. 237, 240-42 (E.D. Ky. 2018).

Cleveland, 585 F.3d 901, 913 (6th Cir. 2009)).  The nonmoving party must do more than simply "show that there is some metaphysical doubt as to the material facts."  Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 428 (6th Cir. 2018) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

Although summary judgment must be used carefully, it "is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut."  FDIC v. Jeff Miller Stables, 573 F.3d 289, 294 (6th Cir. 2009) (quotation marks and citations omitted).

## IV.  Analysis

### A. Administrative Exhaustion

"In permitting federal employees to sue under Title VII, Congress conditioned the government's waiver of sovereign immunity upon a plaintiff's satisfaction of 'rigorous administrative exhaustion requirements and time limitations.'"  McFarland v. Henderson, 307 F.3d 402, 406 (6th Cir. 2002) (quoting Brown v. Gen. Servs. Admin., 425 U.S. 820, 833 (1976)).  "A plaintiff who alleges that a federal agency has engaged in race discrimination must initiate contact with an EEO counselor within forty-five days of the date of the alleged discriminatory act."  Dixon v. Gonzales, 481 F.3d 324, 330 (6th Cir. 2007) (citing 29 C.F.R. § 1614.105(a)(1), and Steiner v. Henderson, 354 F.3d 432, 435 (6th

Cir. 2003)); see also Green v. Brennan, 136 S. Ct. 1769, 1774-76 (2016).  "Failure to comply with this requirement is grounds for dismissal."  Hurst v. Dep't of Veterans Affairs, 2018 WL 4178851, at *1 (6th Cir. July 19, 2018) (citing Steiner, 354 F.3d at 435). Because the forty-five-day requirement is a prerequisite to filing suit and not a jurisdictional requirement, the requirement is subject to equitable tolling, waiver, and estoppel.  See Hykes v. Lew, 2017 WL 4863108, at *2 (6th Cir. Mar. 1, 2017) (citations omitted); 29 C.F.R. § 1614.604(c).

In a Title VII failure-to-hire case, the forty-five-day limitations period starts to run from the date the prospective employer communicated to the plaintiff its decision not to hire him, not from the date on which the plaintiff discovers that the decision not to hire him constituted discrimination.  See Amini v. Oberlin Coll., 259 F.3d 493, 498-501 (6th Cir. 2001) (holding that the EEOC's 300-day limitations period ran from the date on which the plaintiff received a letter from the prospective employer informing him that he had not received the position, not from the date when he discovered that the person who was hired had less experience and was younger); see also EEOC v. United Parcel Serv., Inc., 249 F.3d 557, 562 (6th Cir. 2001) ("[T]he limitations period does not begin to run on a claim for employment discrimination until an employer makes and communicates a final decision to the employee.  Once the employee is aware or reasonably should be aware

of the employer's decision, the limitations period commences.") (citations omitted); cf. Green, 136 S. Ct. at 1782 (Alito, J., concurring) (collecting cases holding that "the time to pursue an employment discrimination claim starts running when a discriminatory act occurs").

It is undisputed that Allen first contacted an EEO counselor on October 4, 2017. (ECF No. 31-1 ¶ 61.) The parties dispute the date the Agency communicated its decision to Allen and when Allen was "aware or reasonably should [have been] aware" he had not been selected for the position. United Parcel Serv., 249 F.3d at 562; (see ECF No. 31-1 ¶ 59.) Braithwaite submits an affidavit from Nguyen, who says that, on May 19, 2017, she notified Allen through USAJOBS.gov that he had not been selected for the Position. (ECF No. 25-3 ¶¶ 1, 7.) ("That on May 19th [handwritten], 2017, Mr. Dexter Allen was notified by the attached email, 00054-00055, through USA Jobs that he was not selected for the GS-0080013, Supervisory Security Specialist position at NRC.") The email to which Nguyen refers is not dated. (See id. at 3-4.) Allen says he never received this email notification and testified that he first learned that he had not been selected for the Position when Figgs told him in September 2017. (ECF No. 27-2 at 42:5-9.) This dispute is material. It determines whether Allen contacted an EEO counselor within forty-five days, i.e., whether Allen timely

11

exhausted his administrative remedies. See 29 C.F.R. § 1614.105(a)(1). The dispute precludes summary judgment.

The relevant regulations mandate that the Agency extend the forty-five-day time limit in specific situations. See 29 C.F.R. § 1614.105(a)(2). One of those is when the plaintiff "shows that he . . . did not know and reasonably should not have been known [sic] that the discriminatory matter or personnel action occurred . . . ." Id. Allen testified that he did not know that he had not been selected until September 2017. (ECF No. 27-2 at 42:5-9.) Whether he reasonably should have known he was not selected for the Position before then is a question for the jury. See Yung v. Raymark Indus., Inc., 789 F.2d 397, 398 (6th Cir. 1986).[3] Braithwaite's Motion for Summary Judgment on the issue of untimely exhaustion of administrative remedies is DENIED.

---

[3] Braithwaite has potentially waived his untimeliness argument because the Agency may have addressed Allen's complaint on the merits at the administrative level without addressing the untimeliness defense. See Momah v. Dominguez, 239 F. App'x 114, 121 (6th Cir. 2007) ("[W]aiver [] occur[s] 'when the agency decides the complaint on the merits without addressing the untimeliness defense.'") (quoting Horton v. Potter, 369 F.3d 906, 911 (6th Cir. 2004). In his Complaint, Allen pleads that the Navy issued a Final Agency Decision on his administrative complaint. (ECF No. 1 ¶¶ 16, 17.) Throughout their briefing, both parties refer to a "Report of Investigation." The parties include only parts of the Report in the record. (See ECF No. 27-3 at 27-30; No. 31-2 at 1-2.) It does not show whether the Agency "decided [Allen's] complaint on the merits" or addressed any untimeliness arguments. Momah, 239 F. App'x at 121. It does appear that the EEO counselor made an initial timeliness determination -- running the limitations period from the date Allen "[g]ained [k]nowledge of [the] [a]ction," and concluded that Allen's EEO complaint was timely. (See ECF No. 27-3 at 10.) On this record, the Court cannot determine whether Braithwaite has waived his timeliness defense.

**B. Failure-to-Hire Claim**

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1). To survive summary judgment, a plaintiff must first provide direct evidence of discrimination or establish a prima facie case, which creates an inference of discrimination based on circumstantial evidence. Seay v. Tenn. Valley Auth., 339 F.3d 454, 463 (6th Cir. 2003) (citing Talley v. Bravo Pitino Rest., Ltd., 61 F.3d 1241, 1248 (6th Cir. 1995)). To establish a prima facie case under Title VII for a failure-to-hire claim, a plaintiff must show that: (1) he is a member of a protected class; (2) he applied for, and did not receive, a job; (3) he was qualified for the job; and (4) a similarly situated person who was not in the plaintiff's protected class received the job. Overall v. RadioShack Corp., 202 F. App'x 865, 868 (6th Cir. 2006); Sheppard v. Univ. of Akron, 2019 WL 2437005, at *6 (N.D. Ohio June 11, 2019).

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to offer a legitimate, nondiscriminatory reason for its decision not to hire the plaintiff. Tex. Dep't of

Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).

If the defendant satisfies that burden, the burden shifts back to the plaintiff to show that the defendant's proffered reason is a pretext for discrimination. Craig v. Tenn. Dep't of Children's Servs., 2019 WL 4093773, at *4 (W.D. Tenn. Aug. 29, 2019) (citing Burdine, 450 U.S. at 253). "A plaintiff can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." Brewer v. Cedar Lake Lodge, Inc., 243 F. App'x 980, 989 (6th Cir. 2007) (citing Seay, 339 F.3d at 463).

**1. Prima Facie Case and Legitimate, Non-Discriminatory Reason**

Braithwaite concedes that Allen can establish a prima facie case of race and color discrimination. (See ECF No. 25-1 at 9.) The burden shifts to Braithwaite to articulate a legitimate, non-discriminatory reason for its failure to hire Allen. Burdine, 450 U.S. at 253. To satisfy its burden at this stage, an employer can "simply 'explain[] what [it] has done' or 'produce[] evidence of legitimate nondiscriminatory reasons.'" Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 n.2 (1978) (per curiam). That burden is "slight" and "merely one of production, not persuasion; it involves no credibility assessment." Halfacre v. Home Depot,

U.S.A., Inc., 221 F. App'x 424, 429 (6th Cir. 2007) (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)).

Braithwaite offers a non-discriminatory reason for hiring Hickman instead of Allen:   Hickman was the "best qualified candidate."   (ECF No. 25-1 at 9-14.)   Braithwaite argues that Hickman was the "best qualified candidate" because the selection process followed the Agency's standard hiring procedure and Hickman's average interview score (81) was higher than Allen's (80).   (Id.)   Braithwaite details the Agency's hiring process for the Position and produces scoresheets and application materials supporting its justification for hiring Hickman.   (ECF Nos. 25-11, 25-12.)   That is sufficient.   See McQueen v. Barr, 782 F. App'x 459, 462 (6th Cir. 2019) (employer met burden when it filed the candidates' applications, detailed its hiring decision, and explained why it chose the successful applicant over the plaintiff).   Braithwaite has satisfied his burden because "[s]electing a more qualified candidate constitutes a legitimate, non-discriminatory reason[]."   Hawkins v. Memphis Light Gas & Water, 520 F. App'x 316, 319 (6th Cir. 2013); Sutherland v. Mich. Dep't of Treasury, 344 F.3d 603, 616 (6th Cir. 2003) ("Quite simply, the non-discriminatory reason for the decision to offer the [] position to [the successful candidate] was that he achieved an overall higher score than [the plaintiff] on the interviews . . . .").

**2. Pretext**

In a Title VII failure-to-hire case, "[w]hen the non-discriminatory reason for the hiring decision is based on the relative qualifications of the hired applicant and the plaintiff, relative qualifications will establish triable issues of fact as to pretext only where the evidence shows: (1) the plaintiff was a plainly superior candidate, such that no reasonable employer would have chosen the latter applicant over the former, or (2) plaintiff was as qualified as, if not better qualified than, the successful applicant, and the record contains 'other probative evidence of discrimination.'" Harris v. City of Akron, 2019 WL 5086127, at *3 (N.D. Ohio Oct. 10, 2019) (quoting Bartlett v. Gates, 421 F. App'x 485, 491) (6th Cir. 2010); see also Bender v. Hecht's Dep't Stores, 455 F.3d 612, 625-28 (6th Cir. 2006). "If a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate — something employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." White v. Baxter Healthcare Corp., 533 F.3d 381, 393-94 (6th Cir. 2008) (citing Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998)).

The Agency's hiring process and evaluation criteria show that Allen was "as qualified as, if not better qualified than," Hickman. Harris, 2019 WL 5086127, at *3.  Given the tabulation error, it is undisputed that Allen scored higher than Hickman and should have been recommended for the Position.  (ECF No. 31-1 ¶ 47.)  Allen can establish pretext if he shows "other probative evidence of discrimination."  Harris, 2019 WL 5086127, at *3; cf. Burdine, 450 U.S. at 259 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination.").

Allen argues that discrimination was evident in his hiring process for four different reasons: (1) the Panel for the Position consisted of three Caucasian men, which is not normal procedure; (2) Allen's scores were never reconciled to address the disparity between Harris and Mohler's scores as compared to Blum's; (3) when Allen previously worked for the Agency, the team for the department he created moved into new offices, and the only two African Americans on the team were forced to stay in old accommodations; and (4) Blum's hiring history shows that he consistently refused to hire African Americans for high-profile positions.  (ECF No. 27-1 at 23-24.)  There is sufficient probative evidence for Allen to meet his burden at this stage.

Panel Composition. "[D]eviation from established policy or practice may be evidence of pretext." Hamilton v. McDonald, 247 F. Supp. 3d 812, 821 (E.D. Ky. 2017) (citing Dunn v. Trs. of Boston Univ., 761 F.3d 63, 73 (1st Cir. 2014)); Dobbs-Weinstein v. Vanderbilt Univ., 1 F. Supp. 2d 783, 799 (M.D. Tenn. 1998) (citations omitted), aff'd, 185 F.3d 542 (6th Cir. 1999). The BUPERS Guide dictates that panel members who make hiring decisions should be composed of members who are of mixed gender and are racially diverse. (ECF No. 25-10 at 10, 26; see also No. 31-1 ¶ 77.) The Panel for the Position consisted of three Caucasian men. (ECF No. 31-1 ¶ 77.) That was not normal procedure. (Id.) Blum testified that he "didn't feel like [the Panel was] diverse enough." (ECF No. 25-8 at 25:19-26:5.) He testified that this was the first panel on which he served where all three members were the same race and gender. (Id. at 26:18-27:2.) Harris testified that he was "concerned about the potential appearance of the [Panel's] membership because the board consisted of three White males" and that there was no "minority or female representation on the [Panel]." (ECF No. 27-3 at 58.) This deviation from established Agency policy governing panel make-up is probative.[4]

---

[4] Braithwaite relies on a statement in White v. Columbus Metropolitan Housing Authority that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext." 429 F.3d 232, 246 (6th Cir. 2005). That statement, however, was in the context of policy deviations that were "minor" or "insufficiently established." See id. The BUPERS Guide is not a minor policy of the Agency or insufficiently established. Although White

Reconciliation. "The fact that the interview panel members award[] different scores — even significantly different scores . . . — does not undermine [a] conclusion that [] applicants were simply scored by the panel members as each saw appropriate based on the pre-determined criteria." Sutherland, 344 F.3d at 619. However, "deviation from established policy or practice [in reviewing those scores] may be evidence of pretext." Hamilton, 247 F. Supp. 3d at 821.

If there are significant differences in candidates' résumé scores, the BUPERS Guide dictates that panel members attempt to reconcile their scores. (ECF No. 25-10 at 13.) "Reconcile" means to discuss how each panel member scored the interviewee and why he was scored that way in order to reach a consensus. (ECF No. 31-1 ¶ 51.) Although the BUPERS Guide does not mandate this reconciliation requirement for the interview process, (see id. at 14), Harris said that in his experience, it was the Agency's custom to reconcile disparities between interviewee scores as well as résumé scores. (ECF No. 27-3 at 62-63 ¶ 30.) Terry Person, a Human Resources Management and Program Assistant who was present during Allen's interview, said that, "if one person scores consistently lower than the other panelists the board should

---

opined that the failure to follow self-imposed regulations or procedures is "generally" insufficient to establish pretext, that does not compel the conclusion that the failure is not probative or not sufficient when combined with other probative evidence of pretext, as here.

discuss it and take it to the next higher authority for resolution if they have to." (ECF No. 31-1 ¶ 56.) Allen had a similar understanding. (See ECF No. 27-2 at 179:3-21.) Although the BUPERS Guide does not expressly mandate reconciliation for the interview process, there is a dispute about whether reconciliation was the Agency's practice or custom.

Here, Allen received interview scores of 87 (Harris), 85 (Mohler), and 69 (Blum). (ECF No. 31-1 ¶ 41.) Given the disparities among those scores, Allen contends that the Panel should have tried to reconcile them, and that reconciliation never happened. (ECF No. 27-1 at 6-13.) Person said "Mohler showed [him] the scores," and Person thought Mohler did that because "Blum's scores for [Allen] were consistently lower than the other panelists' scores." (ECF No. 31-2 at 98 ¶¶ 22, 24.) Person told Mohler, "[i]f you think [Blum's] scores are out of line you can talk to my supervisor . . . about it." (Id. at 98 ¶ 24.) Mohler said that he did not show Person Blum's scores because they were substantially lower than Allen's, but "to ensure [that Person] knew [the Panel] w[as] following the rules." (Id. at 30 ¶¶ 37, 38.) Roberto Chang, the Human Resources Director who was present during Allen's interview, said he communicated to Mohler that he thought the scores were disparate and that the Panel "may want to go back and discuss and reconcile the scoresheets." (ECF No. 27-3 at 76-77 ¶ 22.) Chang said Mohler responded that the Panel

20

"reconciled and they were good with their scores." (Id.)  Harris contends that no reconciliation ever took place. (ECF No. 31-1 ¶ 55.)  Cheney contends that he "review[ed] the scoresheets and found no significant anomalies that would make [him] question the integrity of the board or the process." (ECF No. 31-2 at 14 ¶ 29.)

There is a dispute about whether reconciliation occurred.  It is not disputed that the final scores submitted for Allen were disparate.  The Agency's practice and policy of reconciliation (including the potential custom of reconciliation during the interview process), and deviation from it, if any, is probative. See Hamilton, 247 F. Supp. 3d at 821.

New Offices.  Allen represents that, "when the team for the department Mr. Allen created moved into new, modern offices, the only two African Americans on the team were forced to stay in old, outdated and decrepit accommodations." (ECF No. 27-1 at 23.)  He argues that, "[d]uring a conversation surrounding where certain personnel should be placed when the new department was implemented, [] Blum told Mr. Allen 'you won't always get what you want.'" (ECF No. 31-1 ¶ 78.)  Allen argues that Blum's statement is probative of Blum's and the Agency's "discriminatory animus against African Americans." (See ECF No. 27-1 at 23.)  Braithwaite denies that the justification for the personnel placement was due to racial

animus.  (ECF No. 31-1 ¶ 76.)  Braithwaite denies that Blum's statement is an accurate quotation.  (Id. ¶ 78.)

It is undisputed that, while Allen worked for the Agency and when some of the personnel moved into new offices, Allen and Figgs, the only two who were African American, did not move into the new space.  (ECF No. 31-1 ¶¶ 74, 75.)  Cheney, who was allegedly responsible for that decision, says that he "directed [and] wanted all of the team in the new office and [] Allen requested that [Allen and Figgs] remain in the old office so they could conduct interviews in private."  (ECF No. 31-2 at 15-16 ¶ 34.)

The reasoning behind the office space allocation and whether Blum made the statement Allen alleges he did are disputed.  That dispute is not material because, generally, statements and facts unrelated to a decisional process itself are not probative of discrimination in the hiring process.  See Geiger v. Tower Auto., 579 F.3d 614, 621 (6th Cir. 2009) ("Statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . . of demonstrating animus.") (citing Bush v. Dictaphone Corp., 161 F.3d 363, 369 (6th Cir. 1998)).  Blum's statement, even if accurately quoted, is not probative.

Blum's Hiring History.  Allen argues that "Blum's hiring history shows that he consistently failed to select African Americans for positions that would have exposure as the face of

22

the program." (ECF No. 27-1 at 23-24.) Allen argues that, before being placed on the Panel for the Position, Blum had been the selection official for positions filled by three African American applicants, but that those positions "were support positions, not positions that would be outward-facing or that held any real responsibility or authority." (Id. at 24.) Allen does not provide evidence of the relative qualifications of those applicants or provide other evidence that Blum's decisions in those cases were influenced by racial animus. This fact is not probative.

Scoring. Allen refers to a fifth probative fact: that Person believed Blum "intentionally scored [Allen] lower so he would not be selected for the [P]osition." (ECF No. 31-2 at 99 ¶ 26-27.) Blum explained that his scores were awarded based on Allen's answers and Blum's conclusion that, when compared to Allen, Hickman "came across as very well-spoken," "clear," "answered more of the questions completely," and "did a better overall job of tying in his experiences with what he was saying." (ECF No. 25-8 at 69:9-20.) Person believes that Blum's justification is pretextual because "[Allen] was the only candidate Mr. Blum scored consistently lower." (ECF No. 31-2 at 98 ¶ 22.) Person said it was a "possibility" that Allen's race and color were factors in Blum's scoring. (Id. at 101 ¶ 32.) That is probative.

There is evidence that Allen was as qualified as, or better qualified than Hickman. Allen has provided probative evidence of

discrimination.   That is normally enough for Allen to establish
pretext.  See Harris, 2019 WL 5086127, at *3; see also Jenkins v.
Nashville Pub. Radio, 106 F. App'x 991, 995 (6th Cir. 2004)
(genuine dispute of material fact as to pretext when the plaintiff
provided evidence of irregularities in the hiring selection
process, inconsistencies in the reasons given by the defendant for
not hiring the plaintiff, and the lack of African American women
in supervisory positions at the defendant's business, as well as
evidence of her allegedly superior qualifications).   Braithwaite
argues, however, that Allen cannot establish pretext as a matter
of law because of the honest belief rule.

### 3. Honest Belief Rule

This Circuit has adopted an honest belief rule, which provides
that an employer may "'avoid a finding that its claimed
nondiscriminatory reason was pretextual' if it establishes that it
'reasonabl[y] reli[ed] on the particularized facts that were
before it at the time the decision was made,' even if evidence
later shows that the reason was baseless." Yazdian v. ConMed
Endoscopic Techs., Inc., 793 F.3d 634, 653 (6th Cir. 2015) (quoting
Wright v. Murray Guard, Inc., 455 F.3d 702, 708 (6th Cir. 2006)).
"The rationale behind the rule is that the focus of a
discrimination suit is on the intent of the employer." Smith v.
Chrysler Corp., 155 F.3d 799, 806 (6th Cir. 1998).  "If the
employer honestly, albeit mistakenly, believes in the non-

discriminatory reason it relied upon in making its employment decision, then the employer arguably lacks the necessary discriminatory intent." Id. That is true even if the employer's "conclusion is later shown to be 'mistaken, foolish, trivial, or baseless.'" Tingle v. Arbors at Hilliard, 692 F.3d 523, 531 (6th Cir. 2012) (quoting Chen v. Dow Chem. Co., 580 F.3d 394, 401 (6th Cir. 2009)). "The key inquiry . . . is whether the employer made a reasonably informed and considered decision before taking the complained-of action." Id. (quotation marks and citations omitted).

If the employer establishes its honest belief, "[t]he employee, in turn, 'must be afforded the opportunity to produce evidence to the contrary, such as an error on the part of the employer that is too obvious to be unintentional.'" Blizzard v. Marion Tech. Coll., 698 F.3d 275, 286 (6th Cir. 2012) (quoting Seeger v. Cincinnati Bell Tel. Co., 681 F.3d 274, 286 (6th Cir. 2012)). "[T]he employee must allege more than a dispute over the facts upon which the discharge was based. He must put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." Id. (citing Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir. 2001)).

Here, Braithwaite argues that there is no evidence that race was a factor in the hiring process and that, although the correct

tabulation shows Allen should have scored higher than Hickman, there is no evidence that the incorrect tabulation was on purpose or ignored as a pretext for discrimination.  Braithwaite argues that it was the Agency's honest belief that Hickman was the best qualified candidate due to his higher score.  (ECF No. 31 at 3-10.)  Braithwaite argues that, although "the [hiring] process was not perfect, the decision was a reasonably informed and considered one" because the Agency went through an extensive interview process with multiple steps.  (See id. at 3-4.)

Allen argues that there were a "number of failings at various stages of the selection process, including failure to verify resume information, failure of basic math, and a failure to abide by standard operating procedures regarding reconciliation[,] . . . [and that] [t]hese failures demonstrate . . . that the selection procedure [was] not a reasonably informed process." (ECF No. 27-1 at 25.)

The record can support a finding that the Agency honestly believed that Hickman was the best qualified candidate.  It is true that the Agency's ultimate hiring decision was later shown to be mistaken and that some of the failures Allen mentions led to that mistake.  Those "mistake[s]," alone, however, would be insufficient to show that the Agency's process was not reasonably informed and that it did not honestly believe in its decision. See Tingle, 692 F.3d at 531.  The Agency has shown that it made a

"reasonably informed and considered decision" before selecting Hickman.  Id.  The burden shifts to Allen to "produce sufficient evidence from which the jury could reasonably reject [the Agency's] explanation and infer that the [Agency] . . . did not honestly believe in" the alleged nondiscriminatory reasons for its decision.  Id. (quotation marks omitted) (citing Braithwaite, 258 F.3d at 493–94).

There is evidence in the record on which a jury could rely to reasonably reject the Agency's asserted belief that Hickman was the best qualified candidate.  First, a jury could conclude that Blum did not honestly believe that Hickman was more qualified than Allen in his scoring of the interviewees' answers.  As discussed supra, Person, who was in the room when Allen and Hickman were interviewed and listened to all of the interview answers, believed that Blum intentionally scored Allen lower so he would not be selected for the Position.  (ECF No. 31-2 at 99 ¶¶ 26-27.)  If Person, who had first-hand exposure to the interviews, believed that Blum intentionally scored Allen lower, it is reasonable that a jury could believe so.

Second, there is evidence in the record that the Agency did not adhere to its custom of reconciling disparate interview scores. If the Agency had a custom of reconciling disparate interview scores, and did not do so here, a jury could find that the Agency

27

did not honestly believe that it was making a "reasonably informed and considered decision."   See Tingle, 692 F.3d at 531.

Third, there is evidence that Cheney, who was one of the ultimate decisionmakers for the Position, might not have believed that Hickman was the best qualified candidate.  Cheney said he expected Allen to "come out at number one in the resume and interview process" and that he "was actually hoping [Allen] would be selected for the job." (ECF No. 25-13 at 8 ¶ 22; id. at 15 ¶ 40.)  Cheney said that, "because [Allen] did not score the highest [he] had to pick someone else" because "[t]o select [Allen] over the highest scoring candidate would have been unethical and in [his] opinion would have resulted in a legitimate EEO complaint or grievance from the other person." (Id. at 8 ¶ 22.)  A jury could reasonably conclude that Cheney did not honestly believe that Hickman was the best qualified candidate for the Position.

Although the Agency has asserted an honest belief that Hickman was the best qualified candidate, Allen has put forth evidence on which a reasonable jury could "reject [the Agency's] explanation and infer that the [Agency] . . . did not honestly believe in" the alleged nondiscriminatory reasons for its decision.   Tingle, 692 F.3d at 531.  Braithwaite's Motion for Summary Judgment on the merits is DENIED.

## V.   Conclusion

For the foregoing reasons, Braithwaite's Motion to Dismiss, or in the alternative, Motion for Summary Judgment, is DENIED.


So ordered this 14th day of July, 2020.

/s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE